UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARYLI TIEMANN on behalf of herself and all others similarly situated, | No. 1:15-cv- 2507 |
| Plaintiff, | CLASS ACTION |
| v. | JURY TRIAL DEMANDED |
| AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Maryli Tiemann ("Plaintiff"), through the undersigned attorneys, and on behalf of herself and all others similarly situated (the "Class"), brings this action for damages and equitable relief against the American Express Company and American Express Travel Related Services Company, Inc. (together, "American Express" or "Amex" or "Defendants") pursuant to state antitrust laws, state consumer protection statutes, unjust enrichment and Rule 23 of the Federal Rules of Civil Procedure.

This Complaint is alleged upon information and belief, except as to those allegations which pertain to the named Plaintiff, which are alleged on Plaintiff's personal knowledge.

## I.  NATURE OF ACTION

1.     This is an antitrust action in which Amex entered into illegal vertical agreements, arrangements, contracts, or combinations with merchants known as Anti-Steering Rules or Non-Discrimination Provisions (referred to herein as "Anti-Steering Rules") which artificially inflated the cost of products and/or services sold by merchants who accept American Express credit cards.  Plaintiff is a holder of a MasterCard, Visa, and/or Discover credit cards who does *not*

hold an American Express card or an American Express co-branded credit card (including Amex co-branded credit cards issued by American Airlines, Costco Wholesale Corporation, Delta Airlines, Hilton Honors Worldwide, JetBlue Airways, Lowe's, Macy's and Starwood Hotels). Plaintiff brings this action on behalf of herself and others similarly situated to challenge Amex's rules preventing merchants from encouraging or "steering" consumers to pay for their transactions with credit cards that cost the merchants less to accept (the "Anti-Steering Rules").[1] Merchants incur a fee (known as the "merchant discount rate") each time they swipe an Amex or other credit card.  In the absence of the Anti-Steering Rules, merchants would be free to offer Plaintiff and other Class members incentives to use payment products that carry lower merchant discount fees than do Amex-branded payment cards.  But with the Anti-Steering Rules in place there is nothing to counter the incentives of the credit card networks of Amex, Visa, MasterCard or Discover to charge merchants inflated prices for the credit card services, which in turn has resulted and continues to result in higher prices to Class Members for the goods and services they purchased from these merchants during the Class Period.

2.     In 2010, the United States and the attorneys general of seventeen states[2] brought an antitrust enforcement action in the United States District Court for the Eastern District of New York against Visa Inc. ("Visa"), MasterCard International Incorporated ("MasterCard"), American Express Company, and American Express Travel Related Services Company, challenging each network's anti-steering rules as anticompetitive restraints in violation of Section 1 of the Sherman Antitrust Act, captioned *United States v. American Express Co.*, *et al.*,

---

[1] Defendants refer to these rulers as Non-Discrimination Provisions (the "NDPs").

[2] The current action does not purport to bring claims on behalf of consumers in any of those seventeen states.  Rather, this action brings claims on behalf of consumers in states that were not part of the *In re American Express Anti-Steering Rules Antitrust Litigation*, No. 1:11-md-02221-NGG-RER (MDL No. 2221) (E.D.N.Y.), whose laws permit consumers to bring antitrust

No. 1:10-cv-04496-NGG-RER (E.D.N.Y.). In that litigation, Visa and MasterCard entered into consent decrees wherein they voluntarily agreed to remove or revise the bulk of their challenged restraints. Amex chose to litigate the Government's challenge to their Anti-Steering Rules. Following a seven-week bench trial the Court held in a Decision containing findings of fact and conclusions of law dated February 19, 2015, ECF No. 619 ("Feb. 19, 2015 FOF") that Amex's Anti-Steering Rules are unlawful restraints on trade in violation of Section One of the Sherman Act, 15 U.S.C. § 1.

3. While the Government, states, and merchants all complained about Amex's Anti-Steering Rules, Plaintiff and other Class members bore the brunt of effects from Amex's enforcement of the Anti-Steering Rules, paying increased prices for products and services they purchased using MasterCard, Visa, and Discover payment cards. The Court's decision in *United States v. American Express Co.* found: "Merchants facing increased credit card acceptance costs will pass most, if not all, of their additional costs along to their customers in the form of higher retail prices." Feb. 19, 2015 FOF (citing testimony that "an economically rational merchant is going to pass [the higher costs] on to its customers," and "prices are going to go up with the merchant for everybody"). The higher retail prices caused by the Anti-Steering Rules affect not only those customers who use American Express cards but also customers using Visa, MasterCard and Discovery credit cards.

4. If merchants were free to give their customers incentives to use less costly credit cards, then Amex would face the prospect of losing business as consumers respond to these incentives, and would therefore be under pressure to reduce its merchant discount fees. Amex would thus face *competition* in the market for providing credit card network services to

---

actions.

merchants.  The Anti-Steering Rules insulate Amex from such competition.  By prohibiting merchants from informing Plaintiff and other Class members about how expensive their payment product is to the merchant and providing them incentives to switch to an alternative payment product, the Anti-Steering Rules serve to entrench Amex's position of market power and allow Amex to extract supra-competitive discount rates from merchants within the Class Jurisdictions.

5.     The Anti-Steering Rules ensure that merchants seeking to recoup the supra-competitive fees they pay to Amex, Visa, MasterCard and Discover have no option but to increase the retail prices they charge consumers for goods and services.  Because merchants are forced to mark up the price of products and services generally to cover the costs of accepting Amex-branded payment products – rather than seeking to recoup their costs directly from Amex cardmembers or provide the cardmember incentives to use a less costly payment product – the Anti-Steering Rules effectively compel users of other payment forms to subsidize the rich perquisites enjoyed by Amex cardmembers, including frequent flier miles, free gifts and cash-back rewards.

6.     The Anti-Steering Rules flatly preclude merchants from seeking to compete with one another on the dimension of whether and how they "price" their acceptance services to consumers.  Merchants compete every day on such dimensions as whether to charge for parking, or whether to offer free wi-fi or free shipping.  The Anti-Steering Rules are in essence an edict that merchants may not likewise engage in price competition with respect to the provision of payment card acceptance services.  There is no justification under the antitrust laws for imposing such a ban on competition among merchants.

7.     Because Amex prohibits merchants from offering incentives to Plaintiff and other Class members to use payment cards that carry lower merchant discount fees than do Amex-

branded payment cards, merchants pay Amex excessive fees.  These excessive fees results in a systematic over-pricing of products or services sold to Plaintiff and other Class members by merchants.  Through this action, Plaintiff challenges the imposition of what amounts to an extra "sales tax" to the cost of every retail transaction made by Plaintiff and other Class members with merchants accepting American Express credit cards in the Class Jurisdictions.

## II.  PARTIES

8.     Plaintiff Maryli Tiemann is a citizen of Cumberland County, Maine and during the relevant class period, purchased products or services using her MasterCard, Visa, or Discover credit cards from a merchant that accepts American Express payment cards.  As a result of Defendants' actions described herein, Plaintiff paid more than she would have paid for the products or services in the absence of Defendants' conduct and was therefore injured in her business and/or property.

9.     Defendant American Express Company is a New York corporation with its principal place of business in New York, New York.

10.    Defendant American Express Travel Related Services Company, Inc. is a Delaware corporation, with its principal place of business in New York, New York, and is a wholly owned subsidiary of American Express Company.  American Express Travel Related Services Company, Inc. is generally responsible for all aspects of the payment card business conducted under the American Express brand, including the operation of the American Express network.  Depending on context, as used herein, the terms "American Express" or "Amex" may refer to Defendants or the American Express network or the American Express brand.

11.    Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited

liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

### III.   JURISDICTION AND VENUE

12.      Plaintiff brings this action for actual, multiple, and exemplary damages pursuant to state antitrust, unfair competition and consumer protection laws, and seek to obtain restitution, recover damages and secure other relief against the Defendants for violations of those state laws. Plaintiff and the Classes also seek attorneys' fees, costs, and other expenses.

13.      This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5 million, exclusive of interests and costs, and in which some members of the proposed Class are citizens of a state different from the Defendants.

14.      This Court also has subject matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because the aggregate amount in controversy exceeds $5 million and at least one Plaintiff or class member is from a state different from one defendant.

15.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this district, a substantial portion of the affected trade and commerce discussed below has been carried out in this district, and the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.  Further, venue is proper here because this district is the transferee district of an Order of the Judicial Panel on Multi-District Litigation, dated February 7, 2011.

16.     This Court has *in personam* jurisdiction over the Defendants because the Defendants, either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) are at home in this district and transacted business in this district; (b) had substantial aggregate contacts with this forum; and/or (c) were engaged in an illegal restraint of trade that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this district.

17.     The Defendants engaged in conduct that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

18.     The activities of the Defendants were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States.

## IV.   CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) seeking certification of fourteen separate statewide damage classes asserting claims for damages under the antitrust statutes and/or consumer protection statutes, and law of unjust enrichment, of fourteen jurisdictions: California, District of Columbia, Florida, Kansas, Maine, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, West Virginia, and Wisconsin (collectively, the "State Damages Classes").

20.     The State Damages Classes are comprised of:

> all persons or entities residing in [State] that do not hold an Amex credit card or an Amex co-branded credit card, and that used a MasterCard, Visa, and/or Discover credit card to purchase products or services from merchants in [State] that accepted Amex-branded general purpose credit or charge cards, during the longest period of

time permitted by the applicable statute of limitations (the "Class Period").

Excluded from the Class are Defendants, their parent companies, subsidiaries, agents and affiliates, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

21.     Plaintiff does not know the exact number of Class members because such information is in the exclusive control of Defendants, MasterCard, Visa, or Discover. Plaintiff believes that, due to the nature of the trade and commerce involved, there are millions of Class members, such that joinder of all Class members is impracticable.

22.     Questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, including;

(a)     Whether the Defendants engaged in an agreement, contract, or combination to restrain trade;

(b)     Whether Defendants' conduct caused Class members to pay more for products or services than they would have in the absence of the Defendants' conduct;

(c)     Whether Plaintiff and the other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

(d)     The scope of any injunctive relief to which Plaintiff and the other members of the Class are entitled.

23.     Plaintiff's claims are typical of the claims of the Class because, like other Class members, Plaintiff does not hold an American Express card or co-branded American Express card, and made purchases using her MasterCard, Visa, and/or Discover payment cards from a merchant(s) that accepted American Express general purpose credit cards.

24.     Plaintiff will fairly and adequately represent the interests of the Class in that she has no conflict with other members of the Class.  Furthermore, Plaintiff has retained competent counsel experienced in antitrust, class action, and other complex litigation.

25.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

26.     This class action is superior to any other method for the fair and efficient adjudication of this dispute.  There will be no extraordinary difficulty in the management of this class action.

### V.   FACTUAL BACKGROUND

**A.     Industry Background**

27.     When a consumer presents an Amex-branded credit card for payment, the merchant swipes the card and transmits a record of the transaction to Amex.  Amex then sends to the retailer's bank account an amount of money that is, generally speaking, equal to the transaction amount minus the "merchant discount fee" that Amex charges retailers.  For a typical retailer in many industries, that discount fee is roughly 3% of the total transaction amount.  At 3%, if a card member presents an Amex-branded payment card to make a $100 purchase, the merchant will receive $97 from Amex, and Amex will bill its card member for $100.  The $3 difference is Amex's "discount revenue."

28.     Other credit cards – including Discover-branded credit cards and even most Visa and MasterCard credit cards – are far less costly to the merchant, carrying much lower merchant discount rates than Amex.  As a result, if merchants were able to steer transactions to payment products other than Amex, they would realize significant savings.  In a competitive retail

marketplace, those savings will be passed along to all consumers, including Plaintiff and other Class members in this action, in the form of lower everyday prices for products and services.

### B.     The Anti-Steering Rules

29.     During the Class Period Amex's Anti-Steering Rules have been and are contained in Defendants' acceptance agreements which Defendants require merchants to enter.  During the Class Period over 3 million merchants nationwide were contractually bound by Defendants' Anti-Steering Rules.

30.     There are many ways that a merchant might steer transactions to a less costly payment product, including:

> ○ offering a discount for using a payment product that is cheaper to the merchant, such as Discover, Visa, and MasterCard branded credit cards, while not offering that discount for Amex cards, or any particular type of Amex cards;

> ○ verbally asking customers if they would mind using a different payment  product, as opposed to Amex cards, or any particular type of Amex cards;

> ○ posting signage indicating a preference for a cheaper payment product;

> ○ posting the decals and signs of less expensive payment networks and yet not posting the decal or sign of Amex;

> ○ imposing a small charge (sometimes referred to as a "surcharge") for using all or any subset of Amex-branded payment cards (where the merchant is located in one of the 40 states and the District of Columbia where such surcharges are legal); or

> ○ taking any other actions that merchants may yet devise if they were not constrained by the anticompetitive rules against steering.

31.     Amex's Anti-Steering Rules, however, strictly prohibit merchants from engaging in such pro-competitive practices.  As set forth in Amex's "Merchant Reference Guide-U.S." beginning in or around 2007:  Merchants must not:

☐ indicate or imply that they prefer, directly or indirectly, any Other Payment Products over our Card;

☐ try to dissuade Cardmembers from using the Card;

☐ criticize or mischaracterize the Card or any of our services or programs;

☐ try to persuade or prompt Cardmembers to use any Other Payment Products or any other method of payment (e.g., payment by check);

☐ impose any restriction, conditions, or disadvantages when the Card is accepted that are not imposed equally on all Other Payment Products, except for ACH funds transfer, cash, and checks;

☐ engage in activities that harm our business or the American Express Brand (or both); or

☐ promote any Other Payment Products (except the Merchant's own private label card that they issue for use solely at their Establishments) more actively than the Merchant promotes our Card.

32.     Plaintiff challenges most of these prohibitions as anticompetitive vertical restraints.

33.     The above iteration of Amex's Anti-Steering Rules, taken from the Merchant Payment Guide, is substantially mirrored in American Express's card acceptance agreements with all U.S. merchants.

34.     The intended and actual result of Amex's Anti-Steering Rules is near-total insulation from price-based competition in the payment card acceptance services markets. The Anti-Steering Rules operate to block Amex-accepting merchants from encouraging their customers to use any credit or charge card other than an Amex card, even where that other card is less expensive for the merchant to accept. Steering among the various credit card brands could be accomplished by offering discounts or other monetary incentives to consumers who pay with

a particular type of card, offering non-monetary benefits for using a lower-cost card, displaying the logo of one brand more prominently than others, expressing the merchant's preference as to which type of card it would rather accept, or posting each card's cost of acceptance and letting customers make their own decisions as to which mode of payment they prefer. Under Amex's Anti-Steering Rules, however, a merchant can do none of these things.

35.    A competitor network – such as Discover Network or a new market entrant – may offer to provide comparable services to retailers at a price far lower than that charged by Amex. Such a pro-competitive strategy, however, will not allow this would be competitor to gain any market share from Amex.  The reason that the merchant is disabled by the Anti-Steering Rules from attempting to influence its customers' card choices.  The merchant, for example, cannot offer a 10% discount off the posted purchase price, free shipping, free checked bags, gift cards, or any other monetary incentive for using their Discover card.  The merchant cannot even post a sign that says "We Prefer Discover" at the point of sale.

36.    In the absence of Amex's Anti-Steering Rules, moreover, the fees that Amex is able to charge merchants for processing transactions on the Amex payment card network would be greatly diminished.  Merchants would incur lower fees and pass along the benefits to Plaintiff, other Class members, and consumers in general in the form of lower prices.

37.    Further, beyond achieving such benefits, the abolition of the Anti-Steering Rules would enable consumers to avoid the cost of all the Amex frequent flier miles, Membership Rewards Points®, travel insurance and other perquisites that are financed, at least in part, out of merchant discount fees.  Presently, the benefits enjoyed by Amex cardmembers are largely subsidized by all consumers, including the Plaintiff and other Class members.  If the merchant were free to offer inducements to use less expensive payment forms – or, conversely, to assess a

surcharge for using expensive payment products – then *only* customers who nonetheless choose to use an expensive payment product would be compelled to pay for the privilege. While an affluent shopper who is 200 points shy of a free trip to Hawaii may not balk at a two dollar surcharge on her check-out ticket, other consumers will be relieved of the obligation to subsidize that particular junket.

## VI.   MARKET DEFINITION AND MARKET POWER

38.   Under any appropriate definition of a relevant product market in this case, Amex has substantial market power.

### A.   Relevant Market: General Purpose Credit and Charge Card Network Services (GPCC Network Services) in the United States

39.   The relevant product market consists of the services provided to merchants for accepting credit and charge cards, referred to as "General Purpose Credit and Charge Card Network Services," or "GPCC Network Services." These GPCC Network Services include the core enabling functions provided by networks, which allow merchants to capture, authorize, and settle transactions for customers who elect to pay with their credit or charge card.

40.   The GPCC Network Services market is occupied by just four ostensibly competing firms: Amex, Visa, MasterCard and Discover. Barriers to entry into the relevant market are high.

41.   GPCC Network Services is a distinct product market because merchant consumers exhibit little price sensitivity, and the networks provide core services that cannot reasonably be replaced by other sources. There are no products that are reasonably interchangeable with the network services provided by Amex, Visa, MasterCard and Discover.

42.   American Express' public statements to courts, federal agencies and investors prior to the Government's lawsuit were consistent, for example, that Amex did not compete with

debit card networks because of the limited substitutability between credit and debit.  According to American Express in its 2009 Form 10-K, "[t]he ability to substitute debit cards for credit and charge cards is limited because there is no credit extended and the consumer must have sufficient funds in his or her demand deposit account to pay for the purchase at the time of the transaction as opposed to charge cards where payment is due at the end of the month or credit cards where payment can be extended over a period of time."

43.     The relevant geographic market is the United States, including each of the fourteen states upon which the claims in this action are brought

44.     As a result of the challenged Anti-Steering Rules, American Express's ability to impose supra-competitive prices upon merchants is not meaningfully constrained by price competition from other payment networks.  If Amex increases merchant prices significantly over a competitive baseline – or if a competitor network, such as Discover or MasterCard, drops its merchant fees by a significant amount – the merchants have no ability to steer transaction volume away from the expensive Amex network over to the now-cheaper competitor network. In a properly functioning market, Amex could not raise its prices above a competitive baseline without having transaction volume migrate to less expensive networks.  In economic terms, then, there is extraordinarily low cross-elasticity of demand as between American Express acceptance services and those offered by other networks.  As a result, the product dimension of the relevant market is properly limited to acceptance services for the American Express network.

45.     American Express has market power in the market for American Express card acceptance services.

### B.     Market Power

46.     Amex has demonstrated its market power throughout the relevant period by imposing significant price increases on merchants without any meaningful merchant attrition, due in large part to Amex's highly insistent and loyal cardholder base.  Merchants' ability to resist Amex's anticompetitive vertical restraints such as the Anti-Steering Rules and the significant price increases they enable, by ending acceptance of Amex cards, is checked by a substantial segment of Amex's cardholder base who insist on paying with their Amex cards and who would shop elsewhere or spend less if unable to use their card choice.  Foregoing revenues associated with losing Amex-insistent customers rendered dropping Amex commercially impractical.

47.     Amex's cardholder insistence and loyalty is derived from several sources, most significantly from Amex's Membership Rewards program and other rewards programs which induce loyalty with strong incentives such as reward points for purchases where the points can be redeemed with Amex or with Amex's business partners.

48.     Amex has maintained supra-competitive discount rates; charged significantly different prices to different groups of merchants for reasons unrelated to the cost of providing service; established prices without regard to the cost of providing service; and managed to raise or maintain prices even as sales volume increased substantially.

49.     Amex's market power is also evidenced by its large market share (over 25% in the relevant market), combined with the nature of the market as highly concentrated amongst just four firms and high barriers to entry.

50.     The substantial barriers to entering the payment card network business has meant there have been no successful new entrants in the U.S. credit card network business for over a quarter century – a staggering period of time in any industry.

## VII.   INJURY TO THE CLASS

51.     The Anti-Steering Rules impaired horizontal, inter-brand price competition amongst Amex, Visa, MasterCard and Discover during the Class Period and resulted in Plaintiff and the Class paying supra-competitive prices for goods and services purchased from merchants accepting Amex cards.

52.     The Anti-Steering Rules denied and continue to deny merchants the opportunity to influence their customers' payment decisions and thereby shift spending to less expensive credit cards.

53.     The rules insulate Amex, Visa, MasterCard and Discover from price-based network competition, thereby enabling them to extract supra-competitive discount fees.  But for the Anti-Steering Rules, merchants would be charged lower merchant discount rates than they did and presently do, and merchants would not be compelled to pass the supra-competitive prices on the Plaintiff and other Class members in the form of higher retail prices.  The rules thus inflict upon Plaintiff and other Class members injury in the form of overcharge, representing the difference between (i) the price of products or services paid by Plaintiff and other Class members to merchants who incur fees for processing transactions on cards that are subject to Amex's Anti-Steering Rules, and (ii) the price of products or services that would be paid by Plaintiff and other Class members to merchants who would have incurred fees on those transactions not subject to Amex's Anti-Steering Rules – i.e., if Amex had at  all relevant times been exposed to price competition with other payment networks.

54.     Over time, moreover, American Express has inflicted new and accumulating injury on Plaintiff and other Class members, as it has issued new cards and launched new card products subject to the Anti-Steering Rules, and enlisted U.S. banks and other financial institutions to issue cards to run on the American Express network subject to Amex's Anti-Steering Rules.

55.     Among other things, over the course of the past decade or so, Amex has undertaken a series of major initiatives designed to cause consumers who lie outside Amex's traditional base of corporate and relatively affluent consumers to use Amex-branded credit cards for their everyday purchases.  As a result of Amex's actions in  launching and then promoting these mass-market products – including the "Blue" family  of revolving credit cards and the co-branded Amex-Costco credit cards, among other products – many consumers that would otherwise have made purchases using other  networks' credit cards, which are relatively less expensive to merchants, have instead  made the same purchases using Amex's mass market credit cards, which carry the same high merchant fees as Amex's corporate,  small business and premium charge cards.  Merchants thus incur significantly higher acceptance costs for the same transaction.  And because of the Anti-Steering Rules, merchants are unable to avoid these higher costs through the standard mechanism of pricing, or indeed through any mechanism other than discontinuing acceptance of American Express cards altogether – a course of action that is theoretically possible, but not commercially feasible for most merchants.  All of this results in higher retail prices paid by Plaintiff and other Class members to merchants who accept Amex payment cards for products and services.

56.     Having finally established itself as a viable mass-market revolving credit card brand, Amex began in late 2004 to enlist U.S. banks to issue Amex-branded credit cards subject

to the Anti-Steering Rules.  In 2004, Amex entered into a card issuing relationship with MBNA (which has since been acquired by Bank of America).  The new Amex-branded MBNA credit cards were issued with the clear understanding that their use would be governed by American Express's Anti-Steering Rules, thus allowing Amex to price those cards to merchants at the same high level as Amex's traditional corporate and charge cards, and at levels significantly higher than those garnered by identical MBNA cards issued on other networks.  For its part, MBNA issued the new Amex-networked card to the same customer base as its MasterCard and Visa branded cards.  The net result – because of the Anti-Steering Rules – was that merchants paid more for the same transactions by the same customers on MBNA-issued cards.

57.     Subsequently, Amex reached substantially similar issuing agreements with other third-party issuers, including Citibank (2005), USAA Federal Savings Bank (2006), Bank of America (2006), Barclay's/Juniper Bank (2006), HSBC (2006), GE Money Bank and Pentagon Federal Credit Union (2009).   Because of the Anti-Steering Rules that insulate Amex from competing with respect to merchant discount pricing, all of these issuing deals brought new and accumulating injury to Plaintiff and Class members, as transactions migrated from standard Visa and MasterCard credit cards to much higher priced Amex cards, resulting in higher retail prices. But for the Anti-Steering Rules, American Express and its bank issuer partners would not have been able to launch any of these credit card products at discount rates that exceeded the rates charged by competitor networks for comparable products.

58.     In addition, because of Amex's rules, all the bank-issuing deals inflicted an entirely different form of injury upon Plaintiff and other Class members – namely, they precipitated an escalation of merchant fees *on rival networks*, as well as Amex's.  That is, because Amex enlisted banks to issue cards subject to the Anti-Steering Rules, merchants

incurred higher fees on the Visa and MasterCard networks, quite separate and apart from the increased cost of transactions migrating to Amex.  The reason is straightforward:  Faced with possible mass defections from its bank issuers, who stand to receive a cut of Amex's supra-competitive discount fees by issuing cards on the Amex network, Visa and MasterCard responded by raising their own merchant rates, and shifting their issuing volume to high-merchant fee card products.  Thus, in justifying a major Visa merchant fee hike in 2004, Visa's merchant pricing chief William Sheedy pointed to the MBNA announcement and "American Express' appeal to banks based on higher merchant fees," referring to "American Express' open invitation to banks [as] a competitive challenge that would take more money to counter."

59.     In response, Amex has raised its own prices or has forgone cutting its rates where it otherwise might have.  The result has been an upward spiral of escalating retail prices that would not be possible but for the Anti-Steering Rules.  And because all of these networks have been protected by substantially similar Anti-Steering Rules, the usual forces of competitive economics are unavailable to drive prices down.

60.     As a direct and foreseeable result of Amex's enforcement of its Anti-Steering Rules, Plaintiff and other Class members have suffered damages in an amount to be established at trial.

## VII.   CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATION OF STATE ANTITRUST STATUTES

*On Behalf of Plaintiff, For Violation of Sherman Act Section One*

61.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

62.     During the Class Period, the Defendants have engaged and continue to engage in continuing agreements, contracts, or combinations with respect to the Anti-Steering Rules in

unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below. Among other things, the Anti-Steering Rules represent a vertical non-price restraint that has the effect of restraining inter-brand competition in the market for General Purpose Credit and Charge Card Network Services.

63.     The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

64.     The Defendants have entered into unlawful restraints of trade in violation of California's Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq.*

(a)     During the Class Period, the Defendants entered into and engaged in continuing unlawful agreements, contracts, or combinations in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code § 16720. These unlawful contracts were entered into and effectuated within the State of California.

(b)     The aforesaid violations of Cal. Bus. & Prof. Code § 16720, consisted, without limitation, of continuing unlawful agreements, contracts, and/or combinations by the Defendants.

(c)     The agreements, contracts, or combinations alleged herein have had, inter alia, the following effects: (i) competition in the GPCC Network Services Market has been restrained, suppressed, and/or eliminated in the State of California; (ii) prices paid by Class members using MasterCard, Visa, or Discover payment cards for products and services have been raised, to artificially high, non-competitive levels in the State of California and throughout the Class Jurisdictions; and (iii) those who purchased such products and services have been deprived of the benefit of free and open competition.

(d)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property in that they paid more for products and services than they otherwise would have paid in the absence of the Defendants' unlawful conduct. As a result of the Defendants' violation of Cal. Bus. & Prof. Code § 16720, Plaintiff and members of the Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Cal. Bus. & Prof. Code § 16750(a).

65.     The Defendants have entered into unlawful restraints of trade in violation of the District of Columbia Code § 28-4501, *et seq.*

(a)     The Defendants' agreements, contracts, or combinations have had the following effects: (i) competition in the relevant market was restrained, suppressed, and eliminated throughout the District of Columbia; (ii) prices of products or services were raised to artificially high levels throughout the District of Columbia; (iii) Plaintiff and members of the Class were deprived of free and open competition; and (iv) Plaintiff and members of the Class who paid for products or services using MasterCard, Visa, or Discover payment cards paid artificially inflated prices for such products or services.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements, contracts, or combinations in restraint of trade in violation of District of Columbia Code § 28-4501, *et seq.*

66.     The Defendants have entered into unlawful restraints of trade in Kansas in violation of Kan. Stat. Ann. § 50-101, *et seq.*

(a)     The Defendants' agreements, contracts, or combinations have had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout Kansas; (ii) prices for products or services purchased by Plaintiff and members of the Class were raised at artificially high levels throughout Kansas; (iii) Plaintiff and members of the Class were deprived of free and open competition; and (iv) Plaintiff and members of the Class paid supra-competitive, artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected Kansas commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements, contracts, or combinations in restraint of trade in violation of Kan. Stat. Ann. § 50-101, *et seq.*

67.     Accordingly, Plaintiff and members of the Class seek all forms of relief available under Kan. Stat. Ann. § 50-101, *et seq.*

68.     The Defendants have entered into unlawful restraints of trade in violation of the Maine Revised Statutes, Me. Rev. Stat. Ann. 10, § 1101, *et seq.*

(a)     The Defendants' agreements, contracts, or combinations have had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout Maine; (ii) prices for products or services purchased by Plaintiff and

members of the Class were raised at artificially high levels throughout Maine; (iii) Plaintiff and members of the Class were deprived of free and open competition; and (iv) Plaintiff and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected Maine commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements, contracts, or combinations in restraint of trade in violation of Me. Rev. Stat. Ann. 10, § 1101, *et seq.*

69.     Accordingly, Plaintiff and members of the Class seek all relief available under Me. Rev. Stat. Ann. 10, § 1101, *et seq.*

70.     The Defendants have entered into unlawful restraints of trade in violation of the Nevada Unfair Trade Practice Act, Nev. Rev. Stat. Ann. § 598A.010, *et seq.*

(a)     The Defendants' agreements, contracts, or combinations had the following effects: (i)  price competition in the relevant markets was restrained, suppressed, and eliminated throughout Nevada; (ii) prices for products or services purchased by Plaintiff and members of the Class were raised at artificially high levels throughout Nevada; (iii) Plaintiff and members of the Class were deprived of free and open competition; and (iv) Plaintiff and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected Nevada commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into restraints of trade in violation of Nev. Rev. Stat. Ann. § 598A.010, *et seq.*

71.     Accordingly, Plaintiff and members of the Class seek all relief available under Nev. Rev. Stat. Ann. § 598A.010, *et seq.*

72.     The Defendants have entered into unlawful restraints of trade in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. § 57-1-1, *et seq.*

(a)     The Defendants' agreements, contracts, or combinations had the following effects: (i)  price competition in the relevant markets was restrained, suppressed, and eliminated throughout New Mexico; (ii) prices for products or services purchased by Plaintiff and members of the Class were raised at artificially high levels throughout New Mexico; (iii) Plaintiff and members of the Class were deprived of free and open competition; and (iv) Plaintiff and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected New Mexico commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into restraints of trade in violation of N.M. Stat. Ann. § 57-1-1, *et seq.*

73.     Accordingly, Plaintiff and members of the Class seek all relief available under N.M. Stat. Ann. § 57-1-1, *et seq.*

74.     The Defendants have entered into unlawful restraints of trade in violation of New York's Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.*

(a)     The Defendants' agreements, contract, or combinations had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout New York; (ii) prices for products or services purchased by Plaintiff and members of the Class were raised at artificially high levels throughout New York; (iii) Plaintiff and members of the Class were deprived of free and open competition; and (iv) Plaintiff and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards, or purchased products that were otherwise of lower quality than they would have been absent the Defendants' and their co-conspirators' illegal acts, or were unable to purchase products that they would have otherwise have purchased absent the illegal conduct.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected New York commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into restraints of trade in violation of the New York Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.*   The conduct set forth above is a per se violation of the Act.

75.     Accordingly, Plaintiff and members of the Class seek all relief available under N.Y. Gen. Bus. Law § 340, *et seq.*

76.     The Defendants have entered into unlawful restraints of trade in North Carolina in violation of N.C. Gen. Stat. § 75-1, *et seq.*

(a)     The Defendants' agreements, contracts, or combinations had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout North Carolina; (ii) prices for products or services purchased by Plaintiff and members of the Class were raised at artificially high levels throughout North Carolina; (iii) Plaintiff and members of the Class were deprived of free and open competition; and (iv) Plaintiff and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected North Carolina commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into restraints of trade in violation of N.C. Gen. Stat. § 75-1, *et seq.*

77.     Accordingly, Plaintiff and members of the Class seek all relief available under N.C. Gen. Stat. § 75-1, *et. seq.*

78.     The Defendants have entered into an unlawful restraints of trade in violation of North Dakota's States Uniform Antitrust Act, N.D. Cent. Code § 51-08.1-01, *et seq.*

(a)     The Defendants' agreements, contracts, or combinations had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout North Dakota; (ii) prices for products or services purchased by Plaintiff and members of the Class were raised at artificially high levels throughout North Dakota; (iii) Plaintiff and members of the Class were deprived of free and open competition; and (iv) Plaintiff and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

(b)     During the Class Period, the Defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into restraints of trade in violation of N.D. Cent. Code § 51-08.1-01, *et seq.*

79.     Accordingly, Plaintiff and members of the Class seek all relief available under N.D. Cent. Code § 51-08.1-01, *et seq.*

80.     The Defendants have entered into unlawful restraints of trade in violation of the Oregon Revised Statutes § 646.705, *et seq.*

(a)     The Defendants' agreements, contracts, or combinations had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout Oregon; (ii) prices for products or services purchased by Plaintiff and members of the Class were raised at artificially high levels throughout Oregon; (iii) Plaintiff and members of the Class were deprived of free and open competition; and (iv) Plaintiff and members of the Class

paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

(b)     During the Class Period, the Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into restraints of trade in violation of Oregon Revised Statutes § 646.705, *et seq.*

81.     Accordingly, Plaintiff and members of the Class seek all relief available under Oregon Revised Statutes § 646.705, *et seq.*

82.     The Defendants have entered into unlawful restraints of trade in violation of the South Dakota Codified Laws § 37-1-3.1, *et seq.*

(a)     The Defendants' agreements, contracts, or combinations had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout South Dakota; (ii) prices for products or services purchased by Plaintiff and members of the Class were raised at artificially high levels throughout South Dakota; (iii) Plaintiff and members of the Class were deprived of free and open competition; and (iv) Plaintiff and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

(b)     During the Class Period, the Defendants' illegal conduct had a substantial effect on South Dakota commerce.

28

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into restraints of trade in violation of South Dakota Codified Laws § 37-1, *et seq.*

83.     Accordingly, Plaintiff and members of the Class seek all relief available under South Dakota Codified Laws Ann. § 37-1, *et seq.*

84.     The Defendants have entered into unlawful restraints of trade in violation of the West Virginia Antitrust Act, W. Va. Code § 47-18-1, *et seq.*

(a)     The Defendants' agreements, contracts, or combinations had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout West Virginia; (ii) prices for products or services purchased by Plaintiff and members of the Class were raised at artificially high levels throughout West Virginia; (iii) Plaintiff and members of the Class were deprived of free and open competition; and (iv) Plaintiff and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

(b)     During the Class Period, the Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into unlawful restraints of trade in violation of W. Va. Code § 47-18-1, *et seq.*

85.     Accordingly, Plaintiff and members of the Class seek all relief available under W. Va. Code § 47-18-1, *et seq.*

86.     The Defendants have entered into unlawful restraints of trade in violation of the Wisconsin Statutes § 133.01, *et seq.*

(a)     The Defendants' agreements, contracts, or combinations had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout Wisconsin; (ii) prices for products or services purchased by Plaintiff and members of the Class were raised at artificially high levels throughout Wisconsin; (iii) Plaintiff and members of the Class were deprived of free and open competition; and (iv) Plaintiff and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

(b)     During the Class Period, the Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into unlawful restraints of trade in violation of Wisc. Stat. § 133.01, *et seq.*

87.     Accordingly, Plaintiff and members of the Class seek all relief available under Wisconsin Stat. § 133.01, *et seq.*

88.     Plaintiff and members of the Class in each of the above states have been injured in their business and property by reason of the Defendants' unlawful agreements, contracts, or combinations.  Plaintiff and members of the Class have paid more for products and services

purchased using MasterCard, Visa, or Discover than they otherwise would have paid in the absence of the Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

89.     In addition, the Defendants have profited significantly from the aforesaid conduct in illegal restraint of trade.  The Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiff and the members of the Class.

90.     Accordingly, Plaintiff and the members of the Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**COUNT TWO**
**VIOLATION OF STATE CONSUMER PROTECTION STATUTES**

*On Behalf of Plaintiff, For Violation of State Consumer*
*Protection Statutes*

91.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

92.     The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

93.     The Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*

(a)     During the Class Period, the Defendants committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code § 17200, *et seq.*, by engaging in the acts and practices specified above;

(b)     This claim is instituted pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204, to obtain restitution from the Defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code § 17200, commonly known as the Unfair Competition Law;

(c)     The Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code § 17200.  The acts, omissions, misrepresentations, practices and non-disclosures of the Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*, including, but not limited to, the following: (i) the violations of Section 1 of the Sherman Act, as set forth above; (ii) the violations of Cal. Bus. & Prof. Code § 16720, *et seq.*, set forth above;

(d)     The Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Cal. Bus. & Prof. Code § 16720, *et seq.*, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(e)     The Defendants' acts or practices are unfair to members of the Class in the State of California within the meaning of Cal. Bus. & Prof. Code § 17200; and

(f)     The Defendants' acts and practices are fraudulent or deceptive within the meaning of Cal. Bus. & Prof. Code § 17200.

(g)     Plaintiff and members of the Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by the Defendants as a result of such business acts or practices.

(h)     The illegal conduct alleged herein is continuing and there is no indication that the Defendants will not continue such activity into the future.

(i)     The unlawful and unfair business practices of the Defendants have caused and continue to cause Plaintiff and the members of the Class to pay artificially-inflated prices for products or services.  Plaintiff and the members of the Class suffered injury in fact and lost money or property as a result of such unfair competition.

(j)     The conduct of the Defendants as alleged in this Complaint violates Cal. Bus. & Prof. Code § 17200.

(k)     As alleged in this Complaint, the Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by the Defendants' unfair competition.  Plaintiff and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by the Defendants as a result of such business practices, pursuant to the Cal. Bus. & Prof. Code §§ 17203 and 17204.

94.     The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

(a)     The Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, at artificial and/or non-competitive levels, the prices at which products or services were purchased by members of the Class using MasterCard, Visa, or Discover payment cards in the District of Columbia.

(b)     The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904.

(c)     The Defendants' unlawful conduct had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout the District of Columbia; (ii) prices for products or services purchased by Plaintiff and members of

the Class were raised at artificially high levels throughout the District of Columbia; (iii) Plaintiff and members of the Class were deprived of free and open competition; and (iv) Plaintiff and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

95.     Plaintiff and members of the Class have been injured and are threatened with further injury.  The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq.*, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

96.     The Defendants have engaged in unfair competition in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") which "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. § 501.204(1).

(a)     During the Class Period, the Defendants entered into and engaged in continuing unlawful agreements, contracts, or combinations in restraint of the trade and commerce described above in violation of Fla. Stat. Ann. § 542.15, *et seq.*  These unlawful contracts were entered into and effectuated within the State of Florida.

(b)     This conduct constitutes an unfair trade practice under FDUTPA.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Class have been injured  and seek their actual damages, attorneys' fees and costs pursuant to  Fla. Stat. Ann. § 501.211.

97.     The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico's Unfair Practices Act, N.M. Stat. Ann. § 57-12-1, *et seq.*

(a)     The Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting at noncompetitive and artificially inflated levels, the prices at which Plaintiff and members of the Class purchased products or services using MasterCard, Visa, or Discover payment card systems in New Mexico and took efforts to conceal their agreements from Plaintiff and members of the Class.

(b)     The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M. Stat. Ann. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiff and the members of the Class and the prices paid by them for products or services purchased using MasterCard, Visa, or Discover payment card systems as set forth in N.M. Stat. Ann. § 57-12-2E.

(c)     The Defendants' unlawful conduct had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout New Mexico; (ii) prices for products or services purchased by Plaintiff and members of the Class were raised at artificially high levels throughout New Mexico; (iii) Plaintiff and members of the Class were deprived of free and open competition; and (iv) Plaintiff and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

(d)     During the Class Period, the Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the Class have been injured and are threatened with further injury.

(f)     The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*, and, accordingly, Plaintiff and the members of the Class seek all relief available under that statute.

98.     The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)     The Defendants and their co-conspirators agree to, and did in fact, act in restraint of trade or commerce by affecting at artificial and non-competitive levels, the prices at which Plaintiff and members of the Class purchased products or services using MasterCard, Visa, or Discover payment card systems in New York and took efforts to conceal their agreements from Plaintiff and members of the Class.

(b)     The Defendants' conduct described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(c)     The Defendants' unlawful conduct had the following effects:  (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout New York; (ii) prices for products or services purchased by Plaintiff and members of the Class were raised at artificially high levels throughout New York; (iii) Plaintiff and members of the Class were deprived of free and open competition; and (iv) Plaintiff and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

(d)     During the Class Period, the Defendants' illegal conduct substantially affected New York commerce and consumers.

(e)     During the Class Period, the Defendants directly or indirectly dominated and controlled the relevant markets in New York.

(f)     Plaintiff and members of the Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

99.     The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*

(a)     The Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting at artificial and non-competitive levels, the prices at which Plaintiff and members of the Class purchased products or services using MasterCard, Visa, or Discover payment card systems in North Carolina and took efforts to conceal their agreements from Plaintiff and members of the Class.

(b)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

(c)     The Defendants' unlawful conduct had the following effects: (1) price competition in the relevant markets was restrained, suppressed, and eliminated throughout North Carolina; (2) prices for products or services purchased by Plaintiff and members of the Class were raised at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Class were deprived of free and open competition; and (4) Plaintiff and members of the Class

paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

(d)     During the Class Period, the Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

(e)     During the Class Period, the Defendants directly, or indirectly dominated and controlled the relevant markets in North Carolina.

(f)     Plaintiff and members of the Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNT THREE
## UNJUST ENRICHMENT

*On Behalf of Plaintiff*

100.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

101.    As the result of the Defendants' conduct, Plaintiff and other Class members in the State Damages Classes conferred a benefit upon the Defendants, Defendants received and retained this benefit under such circumstances that it would be inequitable and unconscionable to permit them to retain it without paying this benefit's reasonable value to Plaintiff and other Class members.

102.    Defendants' Anti-Steering Rules enabled Defendants to profitably raise its merchant discount rates during the Class Period, which resulted in ill-gotten gains.

103.    To the extent Plaintiff is required by any state's law to have exhausted administrative remedies before bringing an unjust enrichment claim, exhaustion of any such

remedies is not required in this instance because (a) the issues are of the type that would be appropriate for judicial determination, (b) the Plaintiff would suffer substantial hardship if compelled to exhaust remedies, and (c) applying the doctrine here would result in substantial inequity and economic inefficiency and violate public policy.

104.    As a direct and proximate result of the Defendants' unjust enrichment, Plaintiff and Class members suffered injury and seek an order directing Defendant to return to them the amount each of them improperly paid to the Defendants, plus interest.

## IX.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment on her behalf and on behalf of the Class herein, adjudging and decreeing that:

A.    This action may proceed as a class action, with Plaintiff as the designated Class representative (or where appropriate, subclass representative) and Plaintiff's counsel as Class Counsel;

B.    Directing that Plaintiff's claims for damages may be prosecuted as a class action, on behalf of the Class defined above, under Fed. R. Civ. P. 23(b)(3);

C.    Defendants have engaged in an agreement, contract, or combination in violation of state antitrust laws and that Plaintiff and the members of the Class have been injured in their business and property as a result of Defendants' violations;

D.    Declaring that American Express's Anti-Steering Rules are illegal and directing their rescission;

E.    Plaintiff and the members of the Class recover damages sustained by them, as provided by state antitrust and consumer protection laws, and that a judgment in favor of

Plaintiff and the Class be entered against the Defendants in an amount to be trebled to the extent such trebling is permitted pursuant to such laws;

F.      Plaintiff and other Class members recover restitution in an amount to be proven at trial, as a result of Defendants' unjust enrichment;

G.      Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

H.      Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

I.      Plaintiff and members of the Class receive such other and further relief as may be just and proper.

## X.  DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the Class, hereby demands a jury trial on all causes of action and claims with respect to which they have a right to jury trial.

DATED:  May 1, 2015                    **BERMAN DEVALERIO**

                                       By:   */s/ Joseph J. Tabacco, Jr.*
                                              Joseph J. Tabacco, Jr.

                                       Todd A. Seaver
                                       One California Street, Suite 900
                                       San Francisco, CA 94111
                                       Telephone: (415) 433-3200
                                       Facsimile:  (415) 433-6382
                                       Email: jtabacco@bermandevalerio.com
                                              tseaver@bermandevalerio.com

Marvin A. Miller
**MILLER LAW LLC**
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: (312) 332-3400
Facsimile: (312) 676-2676
Email: mmiller@millerlawllc.com

Susan A. Bernstein
Attorney at Law
200 Highland Avenue, Suite 306
Needham, MA 02494-3035
Telephone: (781) 290-5858
Facsimile: (781) 247-4266
Email:  susan @sabernlaw.com

Simon Bahne Paris
Patrick Howard
**SALTZ, MONGELUZZI, BARRETT**
**& BENDESKY, P.C.**
One Liberty Place, 52nd Floor
1650 Market Place
Philadelphia, PA19103
Telephone: (215) 575-3985
Facsimile: (215) 496-0999
Email: sparis@smbb.com
        phoward@smbb.com

Roberta D. Liebenberg
Donald L. Perelman
Paul Costa
**FINE, KAPLAN AND BLACK**
One South Broad Street, 23rd Floor
Philadelphia, PA  19107
Telephone: (215) 567-6565
Facsimile: (215) 568-5872
Email: rliebenberg@finekaplan.com
        dperelman@finekaplan.com
        pcosta@finekaplan.com

*Counsel for Plaintiff*